
FILED

DEC 15 ....

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

DOMINIQUE MITCHELL,

        Plaintiff,

v.                     ACTION NO. 2:08cv513

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,

        Defendant.

## UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Dominique Mitchell ("Mitchell"), brought this action under Sections 216(i) and 223 of the Social Security Act, 42 U.S.C. § 405(g), 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act").

This action was referred to the undersigned United States Magistrate Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), by order of reference filed May 26, 2009. For the reasons expressed herein, the Court RECOMMENDS that the Commissioner's decision be REVERSED and the case be REMANDED.

### I. PROCEDURAL BACKGROUND

On October 3, 2005, Mitchell filed an application for SSI and DIB alleging an onset of disability as of September 26, 2004, due

to chronic kidney disease, seizures, depression, and hypertension. (R.[1] at 73, 128.) Mitchell's application was denied by the Social Security Administration initially on May 18, 2006 (R. at 73), and upon reconsideration on October 10, 2006 (R. at 80). On December 4, 2006, Mitchell requested a hearing before an Administrative Law Judge ("ALJ") of the Social Security Administration. (R. at 53.) That hearing was held in Norfolk, Virginia, on June 26, 2007. (R. at 1-39.) Mitchell testified at the hearing (R. 5-21) and was represented by counsel (R. at 3, 86-87). Carolyn Mitchell-Smith, Mitchell's mother, (R. at 22-27), and a vocational expert, Edith Edwards (R. at 27-38, 93) were also present and testified at the hearing. On August 24, 2007, the ALJ issued a decision finding that Mitchell was not disabled within the meaning of the Act because Mitchell had the residual functional capacity ("RFC") to work in the national economy. (R. at 53-68.)

On October 10, 2007, Mitchell requested review of the ALJ's decision by the Appeals Council of the Office of Disability Adjudication and Review ("Appeals Council"). (R. at 52.) The Appeals Council denied Mitchell's request for review on August 29, 2008, stating that it found no reason to review or change the ALJ's decision. (R. at 48-50.) This makes the ALJ's decision the "final decision" of the Commissioner subject to judicial review here,

---

[1] "R." refers to the transcript of the administrative record of proceedings relating to this case.

pursuant to 42 U.S.C. § 405(g). See 20 C.F.R. § 416.1481.

Mitchell brought the instant action seeking judicial review of the decision of the Commissioner denying her claims for SSI and DIB. Mitchell filed the instant complaint on November 10, 2008, which Defendant answered on May 22, 2009. Mitchell filed a motion for summary judgment with a memorandum in support on June 29, 2009. Defendant filed a motion for summary judgment and in opposition to Mitchell's motion for summary judgment with a memorandum in support on July 27, 2009. The Court received no response from Mitchell to Defendant's motion for summary judgment. As neither counsel in this case has indicated special circumstances requiring oral argument in this matter, the case is deemed submitted for decision based on the memoranda.

## II.  **FACTUAL BACKGROUND**

Mitchell is a thirty-five year old female, who was twenty-nine on the date of the alleged onset of her disability and thirty-two at the time of the ALJ's August 24, 2007 decision. (R. at 95.) Mitchell attended college for a year and a half, and she has worked in the past as a collector and financial counselor. (R. at 5, 7.) Mitchell alleges that she became disabled as of September 26, 2004 due to chronic kidney disease, seizures, depression and hypertension. (R. at 73, 128.)

The ALJ found that, at the time of the June 26, 2007 hearing, Mitchell suffered from frequent urinary tract infections,

3

depression and anxiety, which the ALJ found to be severe impairments. (R. at 58.) The ALJ found that Mitchell's other impairments were non-severe. (R. at 59.) The ALJ, however, found that Mitchell's severe impairments did not meet or exceed one of the listed impairments in 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926. Id. The ALJ then found that Mitchell had the RFC to perform light work, except she cannot do any climbing or work around hazards such as unprotected heights and/or dangerous or moving machinery, and she is capable of performing simple, unskilled, repetitive tasks. (R. at 60.) The ALJ found that Mitchell could not return to her past work as a collector and financial counselor because this work required constant contact with the public. (R. at 64.) However, the ALJ found that there is a significant number of jobs in the national economy that Mitchell could perform. (R. at 64-65.) Accordingly, the ALJ found that Mitchell was not disabled within the meaning of the Act. (R. at 65.)

### III. **STANDARD FOR SUMMARY JUDGMENT**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For the evidence to present a "genuine" issue of material fact, it must be "such that a reasonable jury could return a verdict for the non-

4

moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Facts are deemed material if they might affect the outcome of the case. Celotex Corp. v. Catrett, 477 U.S. 317, 322-27 (1986). In other words, the moving party's submission must foreclose the possibility of the existence of facts from which it would be open to a jury to make inferences favorable to the non-movant. Id.

In deciding a summary judgment motion, the Court must view the record as a whole and in the light most favorable to the non-moving party. Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985). If "the evidence is so one-sided that one party must prevail as a matter of law," the Court should grant summary judgment in that party's favor. Anderson, 477 U.S. at 251-52. Moreover, summary judgment must be granted where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial," Celotex, 477 U.S. at 322, as the non-moving party is required to "set forth specific facts showing that there is a genuine issue for trial" with respect to that element. Fed. R. Civ. P. 56(e).

When confronted with cross-motions for summary judgment, "the standards upon which the Court evaluates the motions for summary judgment do not change." Taft Broad. Co. v. United States, 929

5

F.2d 240, 248 (6th Cir. 1991). "[T]he Court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" <u>Rossignol v. Voorhaar</u>, 316 F.3d 516, 523 (4th Cir. 2003) (quoting <u>Philip Morris Inc. v. Harshbarger</u>, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

## IV. STANDARD FOR REVIEW OF THE COMMISSIONER'S DETERMINATION

The Commissioner ultimately held that Mitchell was not under a disability within the meaning of the Act. Under 42 U.S.C. § 405(g), the scope of judicial review of the Commissioner's final decision is specific and narrow. <u>Smith v. Schweiker</u>, 795 F.2d 343, 345 (4th Cir. 1986). This Court's review of that decision is limited to determining whether there is substantial evidence in the administrative record to support the Commissioner's decision. 42 U.S.C. § 405(g); <u>Hunter v. Sullivan</u>, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam), <u>superceded in non-relevant part by</u> 20 C.F.R. §§ 404.1517(d)(2), 416.927(d)(2); <u>Hays v. Sullivan</u>, 907 F.2d 1453 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Hunter</u>, 993 F.2d at 34 (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. <u>Id.</u> (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)).

The Commissioner has the duty to make findings of fact and

6

resolve conflicts in the evidence. Hays, 907 F.2d at 1453 (citing King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979)). The Court does not conduct a de novo review of the evidence or of the Commissioner's findings. Schweiker, 795 F.2d at 345. In reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, to make credibility determinations, or to substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citing Hays, 907 F.2d at 1456). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or on the Commissioner's designate, the ALJ)." Id. at 589 (quoting Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987)). The denial of benefits will be reversed only if no reasonable mind could accept the record as adequate to support the determination. Richardson, 402 U.S. at 401. The issue before this Court, therefore, is not whether Mitchell is disabled, but whether the Commissioner's finding that Mitchell is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See id.; Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987) ("[A] factual finding by an [ALJ] . . . is not binding if it was reached by means of an improper standard or misapplication of law.").

## V. **ANALYSIS**

The Social Security Regulations define "disability" for the

purpose of obtaining disability benefits under Title II of the Act as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment[2] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a); see also 42 U.S.C. § 423(d)(1)(a). To meet this definition, the claimant must have a severe impairment that makes it impossible to do previous work or any other substantial gainful activity[3] that exists in the national economy. 20 C.F.R. §§ 404.1505(a), 416.905(a); see also 42 U.S.C. § 423(d)(2)(A).

## A. Sequential Disability Analysis

The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled, which is set forth at 20 C.F.R. § 416.920. See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981). Under this process, the ALJ must determine in sequence:

(1) Whether the claimant is engaged in substantial gainful activity (i.e., whether the claimant is working). If so,

---

[2] A "physical or mental impairment" is an impairment resulting from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

[3] "Substantial gainful activity means work that (1) Involves doing significant and productive physical or mental duties; and (2) Is done (or intended) for pay or profit." 20 C.F.R. §§ 404.1510, 416.910.

the claimant is not disabled and the inquiry is halted.

(2) Whether the claimant has a severe impairment. If not, the claimant is not disabled and the inquiry is halted.

(3) Whether the impairment meets or equals the medical criteria of 20 C.F.R., Part 404, Subpart P, Appendix 1, which sets forth a list of impairments that warrant a finding of disability without considering vocational criteria. If so, the claimant is disabled and the inquiry is halted.

(4) Whether the impairment prevents the claimant from performing past relevant work. If not, the claimant is not disabled and the inquiry is halted.

(5) Whether the claimant is able to perform any other work considering both his residual functional capacity[4] and his vocational abilities. If so, the claimant is not disabled.

## 1. Steps One Through Three

In this case, the ALJ decided at step five of the analysis that Mitchell was not disabled. At step one of the analysis, the ALJ determined that Mitchell had not engaged in substantial gainful activity since her alleged date of onset of disability, September

---

[4] "Residual functional capacity" is the most a claimant can do in a work setting despite the physical and mental limitations of her impairment and any related symptoms (e.g., pain). See 20 C.F.R. § 416.945(a)(1).

26, 2004.  (R. at 58.)  At step two, the ALJ determined that Mitchell's frequent urinary tract infections, depression and anxiety are severe impairments.  Id.  At step three, the ALJ found that Mitchell did not have a severe impairment or combination of impairments that meet or medically equal one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (R. at 59.)

## 2.  The ALJ's RFC Determination

Prior to steps four and five, the ALJ determined Mitchell's RFC to perform the requirements of her past relevant work or other work existing in significant numbers in the national economy.  (R. at 60-64.)  The ALJ defined RFC as the claimant's "ability to do physical and mental work activities on a sustained basis despite limitations from her impairments."  (R. at 57.)  The RFC determination was based on the ALJ's evaluation of the evidence in the record, including Mitchell's testimony, and the findings of treating, non-treating and other consulting physicians, and the state agency's disability determination, rendered by a non-examining physician, which reflect judgments about the nature and severity of the impairments and resulting limitations.  (R. at 60-64.)  Based on the evidence as a whole, the ALJ determined that Mitchell is capable of performing light work, and she is capable of performing simple, unskilled, repetitive tasks.  (R. at 60.)  The ALJ also found that Mitchell could not do any climbing or work

10

around hazards such as unprotected heights and/or dangerous or moving machinery. Id. Ultimately, the ALJ determined that Mitchell retained the RFC to perform a limited range of light work. (R. at 65.)

### a. Claimant's Testimony

In reaching a conclusion about Mitchell's RFC, the ALJ gave consideration to Mitchell's testimony. The ALJ noted in his opinion that Mitchell's medically determinable impairments could be reasonably expected to result in her alleged symptoms, but Mitchell's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. at 61.) The ALJ found that the objective medical evidence does not support many of Mitchell's allegations, and there are numerous inconsistencies in the records. Id. Specifically, the ALJ found that Mitchell had reported on several occasions to new treating and/or examining physicians that she had recently lost a large amount of weight in a short period of time, but these reports of weight loss are not supported by the medical records. Id. Additionally, Mitchell alleged that she spent most of her time in bed, but her examinations did not show muscle atrophy or loss of lower extremity strength. (R. at 62.) Also, Mitchell reported that she had lupus, but there was no diagnosis of lupus in the medical records, only a note that it was a possibility. (R. at 62, 142, 432, 434.) The ALJ also cited the lack of any medical

documentation regarding Mitchell's seizures; despite her report of having two to three seizures a week, these were never witnessed by medical professionals and she did not seek emergency room treatment following a seizure. (R. at 62.) Further, the ALJ noted that Mitchell reported to her psychiatrist in March 2006 that she had not had a seizure for three years. Id. The ALJ concluded, "[t]he inconsistencies tend to reflect poorly on the claimant's overall credibility." Id.

### b. Review of the Medical Evidence

The ALJ considered the objective medical evidence in the record and found that "[w]hile the claimant's impairments are severe in that they have more than a minimal affect on her ability to function, they are not totally disabling and do not preclude the performance of all substantial gainful activity." (R. at 64.) Specifically, the ALJ found that despite Mitchell's complaints of severe abdominal and pelvic pain, objective testing and evaluations have been normal, and no physician to whom the claimant was referred determined an etiology for her subjective complaints. (R. at 63.) Additionally, the ALJ found the record indicates a history of noncompliance with medication. (R. at 63-64.) Further, the ALJ noted that Mitchell was able to work at "the substantial gainful activity level" after being diagnosed with having a seizure disorder due to control by medication, and she also was able to do skilled work without interference from her depression and anxiety,

12

which she reported experiencing since age twelve. (R. at 64.)

The ALJ considered the medical source opinions of treating and examining physicians in the record. (R. at 62-64.) On December 14, 2004, claimant saw Dr. Edward B. Ostroff for her ongoing hematuria. (R. at 196.) Dr. Ostroff's records indicate that Mitchell had significant hypertension and significant hematuria, but that she had normal x-rays, ultrasounds, IVPs, and CAT scans in the past. Id. After doing a cystoscopy, Dr. Ostroff found Mitchell's bladder looked "perfectly normal," but there was a fair amount of pseudo polypoid reaction at her bladder neck. Id. Mitchell's records from Dr. John S. Liu indicate that Mitchell had another cystoscopy in November 2005, where again no abnormalities were found. (R. at 206.) In August of 2005, Mitchell had a laparotomy and lysis of abdominal adhesions, and she reported feeling better after the operation. (R. at 210.)

The ALJ also considered medical evidence relating to Mitchell's mental health. (R. at 62.) The ALJ noted that Mitchell initially sought psychiatric treatment in November 2005. Id. Mitchell complained of depression and anxiety to TaTonja Jones, her family nurse practioner at Olde Town Family Practice in the months prior to this appointment. (R. at 260-67.) However, Mitchell did not have her first individual therapy session until April 2006 (R. at 329-30), and she was inconsistent in seeing a psychiatrist, seeking counseling and staying on her medications (R. at 222-23,

13

329-34, 419-20). Mitchell's psychiatric records reflect both improvements and continued anxiety and depression. (R. at 222-23, 328-29, 419-20, 425, 428.)

Additionally, the ALJ reviewed Dr. Edward H. Spain's neuropsychological examination of Mitchell in May 2006. (R. at 62-63.) Dr. Spain indicated a global assessment of functioning (GAF) of 50, indicating serious impairment in social, occupational or school functioning. (R. at 63, 323.) He noted that Mitchell might have difficulty dealing with co-workers and/or the general public, and Mitchell's mental health condition would interfere to a significant degree with her completing a normal workday or work-week. (R. at 323-24.)

Additional objective medical evidence in the record, and available for the ALJ's review, includes the notes and records from multiple treating physicians and examining physicians. These include:

- Bon Secours Maryview Medical Center Emergency Room Physicians, who treated Mitchell on June 16, 2005, and August 13, 2005. (R. at 197-203.) Mitchell sought pain relief for her pelvic pain prior to her surgery on August 26, 2005. (R. at 197, 202.)

- Dr. Steven V. Lewinsky, who treated Mitchell from March 23, 2006, to April 6, 2007, at Tidewater Kidney Specialists, Inc. (R. at 429-37.) Mitchell was referred to Dr. Lewinsky

by Dr. Singson for hematuria. (R. at 437.) Mitchell weighed 126 pounds and reported a 30 pound weight loss over the past month and half when she saw Dr. Lewinsky in March 2006. (R. at 436-37.) Dr. Lewinsky noted that Mitchell's hypertension was poorly controlled and Mitchell had difficulty getting her medications because she lost medicaid coverage, however it appeared she was taking her blood pressure medicines. (R. at 431.)

- Dr. Liu, who treated Mitchell from February 13, 2004, to December 16, 2005, for her kidney and urinary problems. (R. at 204-221, 225-44.) Dr. Liu repeatedly saw Mitchell for hematuria, bilateral back pain, and sometimes accompanying fever. (R. at 225-44.) Despite her symptoms, Dr. Liu found her urological work-up unremarkable. (R. at 225.)

- Dr. Barot, who treated Mitchell on April 5, 2006, for her seizures. (R. at 316-18.) Dr. Barot had not seen Mitchell since 2000 for her seizures, and noted that she appeared depressed. (R. at 316-17.) Dr. Barot noted that her attention, concentration and memory were normal, and at 118 pounds, she was of average build and well nourished. (R. at 317.) Mitchell reported to Dr. Barot that she was having seizures two to three times a week, which have been observed by family members, involve stiffness, shaking and

usually loss of consciousness. (R. at 316.) Mitchell said her seizures have been observed by family members and she has headaches just before the seizures. Id. Dr. Barot had "a very lengthy discussion" with Mitchell about compliance with medications and follow-up. (R. at 318.) Dr. Barot noted there is a strong possibility that some of Mitchell's seizures could be pseudoseizures. Id.

- Dr. Donald Cochran and TaTonja Jones, family nurse practioner, of Old Towne Family Practice, who treated Mitchell from April 14, 2005 to December 12, 2005. (R. at 245-73.) The records from Old Towne Family Practice indicate that Mitchell complained of pain and found the Duragesic patch helpful, though she stopped using it because she lost her health insurance. (R. at 245, 250, 253, 257.) Mitchell's records also indicate that she experienced a seizure that sent her to the emergency room in April 2005. Mitchell's blood pressure was continuously high, and Ms. Jones switched her medication. (R. at 255-60, 264, 267.) Mitchell also reported crying spells, panic attacks, anxiety and depression, and she was referred to counseling. (R. at 260-64.) Dr. Cochran terminated his treatment relationship with Mitchell on December 20, 2005, stating that the trust and mutual respect that needs to exist in a patient/physician relationship had broken down.

(R. at 247.)

- Dr. Javaid Perwaiz, a gynecologist, who treated Mitchell from April 19, 2002 to December 21, 2005. (R. at 245-73.) Mitchell's records from Dr. Perwaiz indicate that she repeatedly complained of pelvic pain, experienced vaginal bleeding, and did not show up to numerous appointments. Id.

- Dr. Quingyan Zhu, who treated Mitchell from December 13, 2006 to May 18, 2007. (R. at 462-67.) Dr. Zhu assessed Mitchell for generalized epilepsy, which was confirmed by an EEG on June 6, 2006. (R. at 466.) Dr. Zhu noted in December 2006 that Mitchell reported having seizures four to six times per week on average, she was on Dilantin with poor seizure control since January 2000, and she also showed generalized weakness. Id. Dr. Zhu put Mitchell on Lamitcal (R. at 467), which proved not to decrease Mitchell's seizures (R. at 463). Dr. Zhu put Mitchell on Keppra in February 2007, Id., which did decrease Mitchell's seizure frequency to a few times a month (R. at 462). Mitchell lost her health insurance and could no longer afford Keppra, but she was able to rely on Dr. Zhu for samples until May 2007. Id.

Dr. Zhu evaluated Mitchell's physical RFC related to her neurological impairments on January 24, 2007. (R. at

17

396-400.) Dr. Zhu noted that Mitchell has uncontrolled generalized epilepsy and diplopia. (R. at 397.) He stated that she had a poor prognosis for her epilepsy because it was uncontrolled (four to six seizures per week). Id. He also noted that Mitchell complained of severe, disabling pain, which Dr. Zhu found credible. Id. The objective signs include Mitchell's diplopia, dizziness, photophobia, reporting pain as nine to ten on a scale of one to ten, and Mitchell's "obvious distress." (R. at 398.) Additionally, Dr. Zhu noted that Mitchll's medications increase her fatigue and do not eliminate her pain, that she has to lie down during the day, that she is not a malingerer, that her impairments are reasonably consistent with her symptoms and functional limitations, and that she is unable to hold a "low stress" job because her epileptic seizure activity worsens with stress and her migraine headaches are exacerbated. Id. Dr. Zhu noted that Mitchell is likely to have good days and bad days, and she would miss more than three to four days of work per month as a result of her impairments and treatment. (R. at 400.)

- Dr. Florisa S. Singson of Parkway Family Practice physicians, who treated Mitchell from February 14, 2006 to September 20, 2006 (R. at 360-66), and from February 20,

2007 to May 19, 2007 (R. at 468-75).[5] Dr. Singson reported that Mitchell has a history of hypertension, chronic pain, pelvic pain, migraine headaches, reoccurring UTIs, seizure disorder, insomnia, endometriosis, and microscopic hematuria. (R. at 361.) Dr. Singson evaluated Mitchell in March 2006 and noted her primary diagnosis was seizure disorder and chronic pelvic pain, while she also suffered from hypertension and hematuria. (R. at 357.) Dr. Singson noted that Mitchell had limitations in lifting objects over five pounds, bending over or reaching for objects, cognition, standing for more than an hour, walking more than fifty feet, climbing four to six steps, and driving an automobile. (R. at 358.) Dr. Singson also noted that she advised Mitchell to leave her job because of her health and to apply for disability. Id. Dr. Singson noted that Mitchell complied with her prescribed treatments and medications and that her condition hinders her ability to care for her child. Id.

Dr. Singson also evaluated Mitchell's physical RFC in February 2007. (R. at 401-408.) Dr. Singson noted that Mitchell had a fair prognosis, but that Mitchell complained

---

[5] The Court is unable to decipher most, if not all, of the handwriting in these medical records, and it is unclear to what extent the ALJ was able to review their content. The ALJ does not specifically refer to these records in his opinion.

19

of severe, disabling pain. (R. at 402.) Dr. Singson noted that Mitchell complained of chronic lower back pain, migraine headaches and pelvic pain, which she found credible. Id. Dr. Singson noted that the pain medications taken by Mitchell make her drowsy and sedated, and they do not eliminate Mitchell's pain. (R. at 402-03.) Dr. Singson also noted that Mitchell has to lie down during the day, that she is not a malingerer, and Mitchell's depression and anxiety contribute to her functional limitations. (R. at 403.) Dr. Singson found Mitchell incapable of even "low stress" jobs because Mitchell's pain increases with stress. Id. She noted that Mitchell would likely be absent from work due to her impairments or treatment more than four times per month, adding specifically that Mitchell would miss more than three to four weeks. (R. at 405.)

### 3. **Step Four**

The ALJ found in step four that based on the evidence in the record and Mitchell's past relevant work as a financial counselor and as a collector, Mitchell did not retain the RFC to perform the functional demands of that work because it was skilled work that required constant contact with the public. (R. at 64.)

### 4. **Step Five**

It is the claimant who bears the initial burden of proving the

20

existence of a disability.  42 U.S.C. § 423(d)(5); 20 C.F.R. §§ 404.1512, 416.912; <u>Smith v. Califano</u>, 592 F.2d 1235, 1236 (4th Cir. 1979).  Once the claimant has established at step four that she cannot do any of the work she has done in the past because of severe impairment, and lacks the RFC to return to her former employment, the burden shifts to the Commissioner at step five to show that jobs exist in significant numbers in the national or local economy that the claimant could perform consistent with her RFC, age, education, and past work experience.  <u>Hunter</u>, 993 F.2d at 35; <u>Wilson v. Califano</u>, 617 F.2d 1050, 1053 (4th Cir. 1980).

In the instant case, the ALJ found that Mitchell's medical condition did not prevent her from finding and performing light work, except she cannot do climbing or work around hazards such as unprotected heights and/or dangerous or moving machinery.  (R. at 60, 64-65.)  The ALJ took into consideration Mitchell's RFC, age, education, and work experience along with the Medical-Vocational Guidelines of Appendix 2 of the regulations, 20 C.F.R. Subpart P, Regulations No. 4.  (R. at 64-65.)  The ALJ took testimony from the independent vocational expert that there is a significant number of jobs at the unskilled, light exertional level that Mitchell could perform, even with her additional limitations, existing in the national and local economies.  <u>Id.</u>  The ALJ ultimately determined that Mitchell was not disabled under the Social Security Act, and that she was not eligible for SSI benefits or DIB under the Act.

(R. at 65.)

## B. Plaintiff's Allegations

Mitchell makes four arguments regarding the ALJ's analysis: (1) the ALJ failed to develop a complete record by not subpoenaing certain medical records; (2) the ALJ erred by finding Mitchell to be only partially credible; (3) the ALJ failed to give the proper weight to Mitchell's treating physicians; and (4) the ALJ's finding that Mitchell's seizure impairment and hypertension were not severe is not supported by substantial evidence. These arguments are addressed in turn.

### 1. The ALJ's Development of the Record

Generally, "the ALJ has a duty to explore all relevant facts and inquire into issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). The ALJ may develop the record by questioning witnesses, requesting evidence, and subpoenaing witnesses. 20 C.F.R. §§ 404.944, 404.950(d). However, the Court notes that it is the plaintiff's burden to present evidence of disability, Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981), and plaintiff bears the burden of non-persuasion. Seacrist v. Weinberger, 538 F.2d 1054, 1057 (4th Cir. 1976).

Here Mitchell alleges that the ALJ failed to develop a complete record because the ALJ agreed to subpoena records from Dr.

Rice, Mitchell's rheumotoligst, but the records were never subpoenaed. (Pl.'s Mem. 8.) When a claimant argues that the ALJ did not develop a complete record, as Mitchell is arguing here, "there must be a showing of prejudice before [the court] will find that the claimant's right to due process has been violated to such a degree that the case must be remanded to the Secretary for further development of the record." Brown v. Shalala, 44 F.3d 931, 935 (11th Cir. 1995). Even assuming the ALJ erred by failing to subpoena Dr. Rice's records, Mitchell must show that she was prejudiced by this failure. Id. However, Mitchell makes no allegation of prejudice. She does not proffer what Dr. Rice's medical records would indicate, nor does she argue that the records from Dr. Rice contain any evidence that would be pertinent to the ALJ's decision. See George v. Astrue, No. 09-10147, 2009 WL 1950266, at *2 (11th Cir. July 8, 2009). Accordingly, the Court FINDS that the ALJ did not err by failing to subpoena Dr. Rice's records.

## 2. Mitchell's Credibility

Mitchell claims that the ALJ improperly found her to be only partially credible, alleging that the ALJ's finding was "based upon conjecture, twisting of the facts, and citing medical opinions that are not found in the record." (Pl.'s Mem. 8.) Specifically, Mitchell argues that the ALJ's finding that Mitchell exaggerated her weight loss was erroneous because there are no records of

23

Mitchell's weight during the time period she claims to have lost thirty or more pounds, that the ALJ improperly concluded that Mitchell was not restricted to lying in bed because her examinations did not show muscle atrophy or loss of lower extremity strength, that the ALJ improperly concluded from the medical records that Mitchell told her psychiatrist in March 2006 that she had not had a seizure for three years, and that the ALJ improperly weighed the fact that Mitchell reported having lupus without a definitive diagnosis. Id. at 9-11. Additionally, Mitchell notes that the ALJ did not assess the credibility of her mother, who testified at the hearing. Id. at 12. In summary, Mitchell argues that ALJ's credibility finding was inconsistent with the evidence in the record.

Credibility determinations are reserved to the ALJ. See Hays, 907 F.2d at 1456; Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985); King, 599 F.2d at 599; see also Craig, 76 F.3d at 589 ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or on the Commissioner's designate, the ALJ)." (quoting Walker, 834 F.2d at 640)). The Court's analysis is therefore restricted to determining if the ALJ's decision is supported by substantial evidence and whether the ALJ employed the correct legal standard. See Craig, 76 F.3d at 589.

In evaluating a claimant's statements regarding pain or other symptoms in disability determinations, the ALJ must follow a two-step process: (1) determine whether there is objective medical evidence showing the existence of a medical impairment or impairments that could reasonably be expected to produce the pain or other symptoms alleged; and (2) if there is such evidence, evaluate the intensity and persistence of the claimant's symptoms, including pain, and the extent to which they affect her ability to work. Soc. Sec. Rul. 96-7p. In conducting the second step of the analysis, using all available evidence, the ALJ is required to make a credibility determination as to the claimant's statements regarding the intensity, persistence, or functionally limiting effects of her symptoms whenever the claimant's statements "are not substantiated by the objective medical evidence" and suggest a greater degree of impairment than can be supported by the objective medical evidence alone. Id.; see also 20 C.F.R. § 404.1529(c)(4). Where the ALJ makes a negative credibility determination, he must specify the reasons for his decision and the evidence informing it. Hammond, 765 F.2d at 426.

> It is not sufficient to make a conclusory statement that "the [claimant]'s allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the [ALJ] simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make

> clear to the [claimant] and to any subsequent
> reviewers the weight that the [ALJ] gave to the
> [claimant]'s statements and the reasons for that
> weight.

Soc. Sec. Rul. 96-7p.

In the instant case, the ALJ provided support for his negative credibility determination. In finding that Mitchell's testimony was only partially credible, the ALJ specified the reasons for his decision and discussed the evidence supporting the decision. (R. at 61-62.) The ALJ acknowledged that Mitchell's "medically determinable impairments could reasonably be expected to produce the alleged symptoms," but her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible. The objective medical evidence does not support many of [Mitchell]'s allegations." (R. at 61.) For example, "claimant testified that she had two to three seizures per week, [but] they have never been witnessed by a medical health care provider and there are no emergency room records that substantiate the frequency alleged or even emergency room treatment following a seizure."[6] (R. at 62.) Additionally, Mitchell reported that she

---

[6] The ALJ also states that Mitchell reported to her psychiatrist in March 2006 that she had not had a seizure for three years. (R. at 62, R. 331.) However, Mitchell claims this note refers to the last time she had a "grand mal" seizure specifically, not the last time she had a seizure. (Pl.'s Mem. 11.) Regardless, the Court questions the significance of the psychiatrist's note. For one, this report is inconsistent with Mitchell's reports to multiple physicians throughout the record from the same time period and easily could have been a typographic error. Additionally, the psychiatrist's note states that Mitchell has a seven-year-old

26

had lupus, when the record reflects that she merely had a positive ANA test, and there was no actual diagnosis. (R. at 62, 142, 425, 430, 432, 466.) The ALJ also noted that Mitchell complains of severe lower abdominal and pelvic pain, however objective testing has not revealed an etiology for these complaints. (R. at 63.)

In addition, the ALJ noted that inconsistencies in the record reflect poorly on Mitchell's credibility. For example, Mitchell's statements to medical professionals that she experienced significant weight loss were not supported by the medical records.[7] (R. at 61.) Additionally, though Mitchell reported spending most of the day in bed, only one medical record indicates that she has

_____

child, which is not the case, indicating the psychiatrists notes might not be entirely accurate. Finally, the next page of the psychiatrist's notes indicates that Mitchell reported her memory was especially poor after a seizure; if Mitchell had not had a seizure in three years, this note would not be relevant. Nevertheless, without giving any significance to this inconsistency in the record, the ALJ's finding that Mitchell was partially credible is still supported by substantial evidence.

[7] On March 23, 2006, Mitchell weighed 126 pounds and reported to Dr. Lewinsky that she lost thirty pounds over the past month and half. (R. at 436-37.) There are no medical records that indicate Mitchell's weight in January or February 2006, however, in November 2005, Mitchell reported that she weighed 128 pounds. (R. at 127.) Moreover, on April 5, 2006, Dr. Barot noted, "[r]eview of systems is negative for weight loss. . . . The patient weighs 118 pounds." (R. at 317.) Then, on May 1, 2006, Mitchell reported to Dr. Spain that she weighed 118 pounds and had lost around fifty pounds in approximately two months. (R. at 319.) Finally, on September 11, 2006, Mitchell reported having lost thirty pounds in two to three months on her function report. (R. at 151.) However, Dr. Lewinsky's medical records indicate that Mitchell weighed 124 pounds on August 30, 2006, only one pound less than she weighed on May 30, 2006. (R. at 431.)

"generalized weakness." (R. at 62, 466.) Furthermore, Dr. Barot noted in April of 2006, "[Mitchell] is of average build and is well nourished. . . . Motor exam shows normal size and shape of the muscles. There is no evidence of any atrophy or fasciculations. . . . Tone is normal." (R. at 317-18.)

The ALJ's determination that Mitchell is not totally credible is amply supported by the administrative record, and the ALJ thoroughly explained the evidence he considered in making his credibility determination. Based on the foregoing, the Court FINDS that there is substantial evidence in the administrative record to support the ALJ's determination that Mitchell is partially credible.

### 3. Weight to Mitchell's Treating Physicians

Mitchell alleges that the ALJ improperly rejected the medical opinions of Dr. Singson and Dr. Zhu. (Pl.'s Mem. 14-15.) Defendant responds that "[t]he ALJ's decision shows that he addressed all of the relevant physicians' opinions in this case." (Def.'s Mem. 20.) Additionally, Defendant provides further explanation about why the opinions of Dr. Zhu and Dr. Singson should not be afforded considerable weight. Id. at 20-24.

A treating physician's opinion as to the existence, nature, or severity of a claimant's impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

other substantial evidence in the record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The physician's opinion should be given "significantly less weight" when it is not supported by clinical evidence or is not consistent with other evidence of record. Craig, 76 F.3d at 590. The ALJ has discretion to give less weight to the opinion of a treating physician where there exists persuasive contrary evidence. Hunter, 993 F.2d at 35.

A treating physician's opinion as to a plaintiff's RFC, however, is not entitled to be given controlling weight or special significance. Opinions on these issues are not "medical opinions," but rather opinions "reserved to the Commissioner because they are administrative findings that are dispositive of a case." 20 C.F.R. § 404.1527(e). Current regulations distinguish between an RFC, which only the Commissioner can determine, and a "medical source statement about what the claimant can still do." See 20 C.F.R. §§ 404.1513(b)(6), 404.1546; Soc. Sec. Rul. 96-5p. Given that such medical source statements are not technically "medical opinions," by definition they can never be given "controlling" weight. See Soc. Sec. Rul. 96-5p. There is "no special significance to the source of an opinion on [such] issues [that are] reserved to the Commissioner . . . ." 20 C.F.R. § 404.1527(e)(3). As such, the ultimate question of whether a claimant is disabled under the Act is an issue reserved to the Commissioner, and therefore a physician's statement that the claimant is "disabled" or "unable to

29

work" may never be accorded controlling weight or any special significance. Id. Nevertheless, because they are medical opinions of a treating physician, they must still be evaluated and may still be entitled to great weight.

Although a statement by a treating physician that the claimant is "disabled" or "unable to work" may never be accorded controlling weight or any special significance,

> opinions from any medical source on issues reserved to the Commissioner must never be ignored. The [ALJ] is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner.

Soc. Sec. Rul. 96-5p; see also 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1) (stating that a treating source opinion on the issue of disability is not determinative of disabled status). Once the ALJ determines that a treating physician's medical opinion is not deserving of controlling weight, the following factors must be considered to determine the appropriate weight, if any, to which the opinion is entitled:

(1) the length of treatment and frequency of examination;

(2) the nature and extent of the treatment relationship;

(3) the opinion's support by medical evidence;

(4) the opinion's consistency with the record as a whole; and

(5) the treating physician's specialization.

30

20 C.F.R. §§ 404.1527(d)(2)-(5), 416.927(d)(2)-(5). These factors may not be omitted or disregarded by the ALJ in weighing the value of a treating physician's medical opinion. See Burch v. Apfel, 9 F. App'x 255, 259, 2001 (4th Cir. 2001) (per curiam) (stating that the ALJ "must consider" the factors set forth in 20 C.F.R. § 404.1527(d) when declining to give controlling weight to the opinion of a treating physician); Newton v. Apfel, 209 F.3d 448, 456 (5th Cir. 2000) (electing to join other federal courts in requiring the ALJ to consider § 404.1527(d) factors before declining to give weight to treating physician's opinion and noting that the ALJ should consider factors on remand); Winford v. Chater, 917 F. Supp. 398, 401 (E.D. Va. 1996) ("[I]f an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must then consider the weight to be given to the physician's opinion by applying the five factors identified in the regulation . . . ."). In addition, the ALJ must consider any other factors that tend to support or contradict the opinion, but only if brought to his attention.[8]    See 20 C.F.R. §§ 404.1527(d)(6), 416.927(d)(6).

## a. **Requirement that ALJ Assign Weight to Medical Opinions**

Pursuant to 20 C.F.R. § 416.927(f)(2)(ii), the ALJ is required

---

[8] For example, the ALJ must consider the medical source's degree of understanding of Social Security disability programs and evidentiary requirements, or the medical source's familiarity with the other information in the claimant's case.    20 C.F.R. §§ 404.1527(d)(6), 416.927(d)(6).

to "explain in the decision the weight given to . . . any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for [the Social Security Administration]." Medical opinions are defined in the relevant federal regulation as "statements from physicians and psychologists or other acceptable medical sources[9] that reflect judgments about the nature and severity of . . . impairment(s), including . . . symptoms, diagnosis and prognosis, what [the patient] can still do despite impairment(s), and [the patient's] physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). In addition to the requirement of 20 C.F.R. § 416.927(f)(2)(ii) mentioned above, 20 C.F.R. § 416.927(d)(2) requires that the ALJ "give good reasons in [his] . . . decision for the weight . . . [given a patient's] treating source's opinion." If the ALJ does not assign weight and give good reasons for that assignment, then the court is ill-equipped to determine whether the ALJ's conclusion is substantially supported by the evidence of record. See Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984) ("We cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant

---

[9] "Acceptable medical source[s]" are defined at 20 C.F.R. 416.913(a) as licensed physicians; licensed or certified psychologists; licensed optometrists for measurement of visual acuity and field; licensed podiatrists for purposes of establishing impairment of foot or foot and ankle, depending on state law; and qualified speech-language pathologists for purposes of establishing speech or language impairments.

evidence."); see also, Trimble v. Barnhart, 7:04cv00711, 2006 WL 229192, at *3 (W.D. Va. Jan. 20, 2006).

If the ALJ fails to provide reasons for his weight determination, then this Court cannot and should not infer from the record reasons to support the ALJ's conclusion. Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004) ("[T]he magistrate judge erred in upholding the Commissioner's decisions by supplying possible reasons for giving less weight to or rejecting the treating physician's opinion. The ALJ's opinion should have been evaluated based solely on the reasons stated in the decision.")

### b. **The ALJ Failed to Assign Weight to Each of the Medical Opinions of Mitchell's Physicians**

In the instant case, the ALJ stated that he "[gave] careful consideration of the entire record" (R. at 56), and his decision mentioned the records and opinions of at least six (6) different medical sources. However, except for Dr. Spain, the ALJ failed to explain the weight he assigned to the opinions expressed by these sources as required under the applicable regulations. Specifically, while the ALJ explicitly gave weight assignments to the opinions of Dr. Zhu and Dr. Singson regarding their opinions on Mitchell's ability to work, see infra, the ALJ did not apply the factors outlined in 20 C.F.R. §§ 404.1527(d)(2)-(5), 416.927(d)(2)-(5). Also, he did not indicate the weight he assigned, if any, to their opinions about the nature and severity of Mitchell's impairments. Likewise, the ALJ did not indicate what weight he

assigned, if any, to opinions that may have been expressed by the other medical sources mentioned in his report, namely, Drs. Ostroff, Liu, and Lewinsky.

### i. Dr. Zhu

The ALJ stated in his decision that Dr. Zhu did not "assess the claimant's abilities to perform work related functions, but merely opine[s] that she cannot work. The opinion[] of . . . Dr. Zhu [is] therefore given no probative weight." (R. at 63.) However, the ALJ did not mention the treatment notes of Dr. Zhu from December 2006 to May 2007, which discuss Dr. Zhu's treatment of Mitchell's uncontrolled seizure disorder. (R. at 462-66.) The Court considers Dr. Zhu's medical findings to be a "statement[] from [a] physician[] . . . that reflects judgment about the nature and severity of [Mitchell's] impairment," 20 C.F.R. § 416.927(a)(2), an issue separate from Dr. Zhu's incomplete evaluation of Mitchell's RFC. Accordingly, the ALJ was required, but failed, to explain the weight he gave to this medical opinion, if any, in his decision.[10] 20 C.F.R. § 416.927(f)(2)(ii).

---

[10] The Court notes Defendant's argument that the ALJ did not give weight to Dr. Zhu's opinion because Dr. Zhu had examined Mitchell "on only one or two occasions . . . since December 13, 2006," and Dr. Zhu's opinion of Mitchell's impairments "was not based upon long-term treatment." (Def.'s Mem. 23.) However, the ALJ did not cite these reasons in his findings of fact. (R. at 63.) Additionally, the Court's review of Dr. Zhu's records indicates that Dr. Zhu actually saw Mitchell in person four times in a five month period, on December 13, 2006, January 24, 2007, February 9, 2007, and May 21, 2007.

Moreover, to the extent that the ALJ did not give any probative weight to Dr. Zhu's assessment that Mitchell was unable to work, the ALJ did not apply the five factors enumerated in 20 C.F.R. §§ 404.1527(d)(2)-(5), 416.927(d)(2)-(5). The ALJ merely stated, "speculation as to employability carries no valuable probative weight." (R. at 63.)

### ii. Dr. Singson

The ALJ noted that Dr. Singson treated Mitchell since January 2006, and Dr. Singson completed a residual functional capacity assessment in February 2007. Id. The ALJ stated:

> Basically Dr. Singson did not rate the claimant's abilities, but opined that Ms. Mitchell is unable to work due to chronic pelvic pain, recurrent urinary tract infections and seizure disorder. . . . [She did] not assess the claimant's abilities to perform work related functions, but merely opine[d] that she cannot work. [Her] opinion . . . . [is] therefore given no probative weight.

Id. Again, while the ALJ stated that Dr. Singson's opinion regarding Mitchell's ability to work was not given any probative weight, the ALJ did not apply the five factors enumerated in 20 C.F.R. §§ 404.1527(d)(2)-(5), 416.927(d)(2)-(5). Moreover, the ALJ failed to explain what weight, if any, was given to Dr. Singson's assessment of the nature and severity of Mitchell's conditions. The record includes Dr. Singson's treatment notes from February 14, 2006 to May 19, 2007 (R. at 360-66, 468-75), and Dr. Singson wrote a letter "explaining the severity of [Mitchell's] health," stating

35

that Mitchell has a history of "hypertension, chronic pain, pelvic pain, migraine headaches, reoccurring UTI's, seizure disorder, insomnia, endometriosis and microscopic hematuria," (R. at 361). Despite this, the ALJ failed to explain in his decision the weight, if any, he gave Dr. Singson's medical opinion of Mitchell's conditions. 20 C.F.R. § 416.927(f)(2)(ii).

### iii. Other Medical Sources

The ALJ mentioned the records and treatment notes of various other medical sources, including Drs. Ostroff, Liu, and Lewinsky, and licensed clinical social worker, Renee Edwards. Mitchell does not appear to complain about the failure of the ALJ to address these sources. Nevertheless, to the extent that these sources contain a "statement[] from [a] physician[] . . . that reflects judgment about the nature and severity of [Mitchell's] impairment," 20 C.F.R. § 416.927(a)(2), the ALJ was required, but failed, to explain the weight he gave to these sources, if any, as cited in his decision.

Because the ALJ failed to assign weight to the opinions of Mitchell's physicians and failed to explain the reasons for his assignment of weight, or lack thereof, the Court finds that the Commissioner's decision was not based on substantial evidence. Accordingly, the Commissioner must, on remand: 1) determine, as to each physician mentioned in the ALJ's decision, whether the medical records contain a statement from that physician "that reflects

36

judgment about the nature and severity of [Mitchell's] impairment[s]"; and 2) assign weight to each such medical opinion, pursuant to 20 C.F.R. § 416.927, with appropriate explanation, in accordance with this recommendation.

## 4. **Severity of Plaintiff's Impairments**

Mitchell alleges that the ALJ's finding that her seizure disorder and hypertension were not severe was not supported by substantial evidence. (Pl.'s Mem. 14-17.) Defendant does not address the ALJ's determination that Mitchell's seizure disorder is not severe, but notes that the ALJ accounted for any possible seizure-related limitations in his hypothetical question posed to the vocational expert. (Def.'s Mem. 24.) Defendant further states that Mitchell never proved any work-related limitations resulting from her hypertension. Id.

The second step of the sequential analysis requires that the claimant have a medically determinable impairment or combination of impairments that is severe and has lasted or is expected to last for a continuous period of twelve months or more. 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii). An impairment cannot be established by the claimant's statement of symptoms alone, but must be demonstrated "by medical evidence consisting of signs, symptoms, and laboratory findings." 20 C.F.R. § 404.1508; see also 42 U.S.C. § 423(d)(5)(A). It is the claimant who bears the burden of demonstrating a medically severe impairment or combination of

impairments.  <u>See</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 (1987)
(citing 42 U.S.C. § 423(d)(5)(A), which provides that a claimant
"shall not be considered to be under a disability unless he
furnishes such medical and other evidence of the existence
thereof . . . .").

An impairment is severe within the meaning of the Social
Security regulations if it imposes significant limitations on the
claimant's ability to perform basic work activities.  20 C.F.R.
§ 404.1521(a).  In contrast, an impairment is not severe if it "has
such a minimal effect on the individual that it would not be
expected to interfere with the individual's ability to work."
<u>Evans v. Heckler</u>, 734 F.2d 1012, 1014 (4th Cir. 1982).  Basic work
activities are defined as "the abilities and aptitudes necessary to
do most jobs," which include:

> (1) Physical functions such as walking, standing,
> sitting, lifting, pushing, pulling, reaching,
> carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering
> simple instruction;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-
> workers and usual work situations; and
> (6) Dealing with changes in a routine work
> setting.

20 C.F.R. § 404.1521(b).  In assessing the functionally limiting
effects of a claimant's impairment or combination of impairments,
the ALJ must consider any "symptom-related limitations" --
restrictions caused by symptoms, such as pain, fatigue, or weakness

-- provided that the claimant has "a medically determinable impairment(s) that could reasonably be expected to produce the symptoms." Soc. Sec. Rul. 96-3p. Nonetheless, when the medical evidence shows that the claimant is capable of performing basic work activities, the severity requirement cannot be satisfied. Soc. Sec. Rul. 85-28.

In reviewing the ALJ's determination that a claimant does not suffer from a severe impairment, the court's function "is limited to determining whether substantial evidence exists in the record to support the ALJ's findings." <u>Watkins v. Astrue</u>, No. 2:08cv00056, 2009 WL 3855756, at *17 (W.D. Va. Nov. 17, 2009).

> [T]he court . . . must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. . . . While an ALJ may not reject medical evidence for no reason or for the wrong reason, an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

<u>Id.</u> (internal citations omitted.) However, if an ALJ does not "explicitly indicate the weight given to all relevant evidence," <u>Overby v. Astrue</u>, No. 4:08cv39, 2009 WL 606125, at *3 (E.D. Va. Mar. 5, 2009)(quoting <u>Stawls v. Califano</u>, 596 F.2d 1209, 1213 (4th Cir. 1979), the court "cannot determine on review whether the findings are supported by substantial evidence," <u>Id.</u> (quoting

39

Gordon, 725 F.2d at 235-56). See Arnold v. Secretary, 567 F.2d 258, 259 (4th Cir. 1977)("Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole . . .'" (quoting Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974)).

In this case, the ALJ conducted a review of Mitchell's medical history, dating back to her treatment at Chesapeake General Hospital in January 2004. (R. at 217-18.) Ultimately, the ALJ found that Mitchell's seizure disorder and hypertension are "not severe in that they cause no more than minimally vocationally relevant limitations." (R. at 59.)(citation omitted). The Court has reviewed the entire administrative record, including the additional evidence submitted by the plaintiff to the Appeals Council, and finds that the ALJ's determination that Mitchell did not suffer from a severe impairment or combination of impairments due to her hypertension, is supported by substantial evidence. However, the ALJ's determination that Mitchell's seizure disorder is not a severe impairment is not supported by substantial evidence.

## 1. Mitchell's Hypertension

At the hearing on June 26, 2007, Mitchell testified that her doctors have been unable to control her blood pressure, despite the

40

fact she is on four blood pressure medications and a beta blocker. (R. at 14.) Further, Mitchell's medical records consistently note her hypertension (also referred to as unstable blood pressure) as an existing medical problem. (R. at 196, 204-221, 223, 243-45, 255, 258, 261, 264, 267, 286, 299, 307-08, 316, 332, 334, 340, 357, 362-65, 375, 402, 430-31, 433, 435-37, 466.) However, apart from Mitchell's complaint in the Disability Report that she has "bad headaches and dizzy spells from the hypertension" (R. at 128), there is no evidence in the record of how Mitchell's hypertension limits her ability to work.

In reaching a conclusion about the severity of Mitchell's hypertension, the ALJ took "careful consideration of the entire record," and found that Mitchell's hypertension is "controlled by medications when she is compliant with them." (R. at 58.) Though the Court disagrees that there is substantial evidence in the record that Mitchell's hypertension is controlled by medication,[11]

---

[11] The ALJ likely relied on the Disability Determination Services ("DDS") physician's assessment, given that the physician, Dr. Angelika Ciccone, concluded that Mitchell's "seizures and hypertension are controlled with medication." (R. at 308.) However, the records reviewed by Dr. Ciccone are not consistent with this conclusion. Though Mitchell may have had some success keeping her blood pressure low in early to mid 2005, Dr. Cicconne's own review of the medical records, (R. at 307-08), confirms that Mitchell's blood pressure increased in September and October 2005 (R. at 255-58), Mitchell's physician then increased her prescription medication without success (R. at 260), and in November 2005, the last full month before Dr. Ciccone's review of Mitchell's records ended (R. at 308), Mitchell's blood pressure continued to be elevated and her physician changed her medication (R. at 259-60).

the Court finds there is little to no evidence that Mitchell's hypertension interferes with her ability to work. See Evans, 734 F.2d at 1014. For this reason, Mitchell's hypertension is not "severe" within the meaning of the Social Security Regulations. 20 C.F.R. § 404.1521(a).

## 2. Mitchell's Seizure Disorder

In reaching a conclusion about the severity of Mitchell's seizure disorder, the ALJ merely stated that Mitchell's "seizure disorder . . . [is] controlled by medications when she is compliant with them." (R. at 58.) As noted previously, in determining whether substantial evidence supports this finding, the Court must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. See Sterling Smokeless Coal Co. v. Akers, 131 F.3d 438, 439-40 (4th Cir. 1997).

Mitchell was initially evaluated by Dr. A.J. Barot, a board-certified psychiatrist and neurologist following one episode of generalized tonic/clonic convulsions that was witnessed by family members in 2000. (R. at 316.) At that time, Dr. Barot instructed Mitchell to continue taking Dilantin and to undergo various tests. Id. Mitchell made three follow-up appointments with Dr. Barot, but did not show up for any of them. In April 2006, Dr. Barot saw

42

Mitchell after she was referred by Dr. Singson.[12] Id. Mitchell was still taking Dilantin. Id. She reported to him that she had been having two to three seizures per week, usually characterized by loss of consciousness, which have been observed by family members. Id. She also complained of having headaches just before the seizures. Id.

Dr. Barot's impression was that Mitchell has had seizures since 2000. (R. at 318.) He discussed the need for her to comply with medication and followup appointments, and advised her to have an MRI of the brain and EEG done. Id. He noted that there is a "strong possibility that some of the seizures could be pseudoseizures," but noted that he would wait to decide until after reevaluation. Id.

Mitchell had a brain MRI, a CT scan of the brain, and an EEG in June 2006. The MRI and CT did not reveal significant abnormalities, but the EEG showed primary generalized epilepsy with generalized sharp wave discharges and occasional spikes. (R. at 464, 466, 474.) These tests were considered by Dr. Qingyan Zhu, Mitchell's treating neurologist since June 2006, in December 2006. (R. at 466-67.) Dr. Zhu concluded that Mitchell's seizures were not controlled. (R. at 466.) Dr. Zhu noted that Dilantin was a bad choice for Mitchell's generalized epilepsy, instructed Mitchell

_____

[12] Dr. Singson had evaluated Mitchell in connection with her application for disability benefits. (R. at 359.)

to taper off of Dilantin, and prescribed Lamictal. (R. at 466-67.) Then, in January 2007, Dr. Zhu saw Mitchell again, and she reported having a total of five seizures in the past week, bad headaches and vision changes. (R. at 465.) Dr. Zhu increased Mitchell's Lamictal prescription. Id. In February 2007, Mitchell again reported no decrease in seizures, and Dr. Zhu prescribed Keppra. (R. at 463.) In May 2007, Mitchell reported decreased seizure frequency with the Keppra to a few seizures per month, but she also stated she was unable to afford the Keppra, and she relied on Dr. Zhu's samples. (R. at 462-63.)

At the hearing on June 26, 2007, Mitchell testified that she has seizures "two, three times a week." (R. at 8, 12.) She stated, "if I have a seizure today I will be in the bed for like a day and a half afterwards. Afterwards, my whole entire body aches." (R. at 13.) Mitchell testified that she has been experiencing seizure activity since January 2000, and she takes Lomatol[13] [sic] and Keppra as prescribed to control the seizures. (R. at 9.) She formerly took Dilantin, but changed medications when the Dilantin was not working (R. at 11, 17), and she was having seizures "anywhere from like six of [sic] seven a week at that time" (R. at 11, 17-18).

The ALJ found that Mitchell "had her first seizure in 2000 and

---

[13] The Court assumes Mitchell was referring to Lamictal, which Dr. Zhu prescribed for her.

they were controlled for over four years with medication sufficiently to allow Ms. Mitchell to work at the gainful activity level."[14] (R. at 64.) Additionally, as discussed supra, the ALJ found Mitchell partially credible, and therefore did not fully credit her testimony about the frequency and intensity of her seizures. However, the ALJ provided no other indication of how he concluded that Mitchell's seizures were controlled by medication, despite the vast amount of evidence in the record to the contrary. In fact, none of Mitchell's treating physicians state that her seizures are controlled by medication.[15]

The ALJ did not adequately discuss the evidence that supports Mitchell's allegations regarding her seizure disorder in his decision. For example, he did not assign weight to the medical opinion of Dr. Zhu, who found Mitchell's seizures were "uncontrolled" and was trying to control them by changing and adjusting her medication. (R. at 462-66.) Additionally, the ALJ did not assign weight to the opinion of Dr. Barot. Moreover, the

---

[14] Mitchell testified that during the year she worked for Catholic Charities, from September 2003 until September 2004, she had three seizures while at work. (R. at 20.)

[15] The ALJ likely relied on the Disability Determination Services ("DDS") physician's assessment, given that the physician, Dr. Angelika Ciccone, concluded that Mitchell's "seizures . . . are controlled with medication." (R. at 308.) However, the records reviewed by Dr. Ciccone only date until December 2005, before Mitchell was seen by Dr. Zhu, before Mitchell had an MRI, CT scan and EEG, and before Mitchell's medical records reflect her repeated reports of having seizures multiple times a week.

45

ALJ did not assign weight to the testimony of Mitchell's mother, who stated that she has seen Mitchell have seizures, that after the seizures Mitchell is very lethargic, that Mitchell recently "busted the back of her head" in the bathtub due to a seizure, that after the seizures Mitchell sleeps for a significant period of time, and that Mitchell sometimes has seizures "two to three times a week" and "[s]ometimes it's multiples in a day." (R. at 24-25.)

Because the ALJ failed to assign weight to the opinions of Mitchell's physicians, the ALJ failed to assess the credibility of Mitchell's mother's testimony, and the ALJ failed to explain what evidence he relied on in finding Mitchell's seizures were controlled by medication, the Court is unable to determine that the Commissioner's decision was based on substantial evidence. See Overby 2009 WL 606125, at *4 ("[T]he court is unable to determine whether the ALJ's finding that the plaintff is capable of performing past relevant work is supported by substantial evidence because it is uncertain that the ALJ considered all the relevant evidence or the weight the ALJ attributed to that evidence.").

## C. **Conclusion**

The Court FINDS that the ALJ's decision was not based on substantial evidence. In particular, the ALJ's failure to assign weight to Mitchell's treating physicians, as well as the ALJ's failure to explicitly indicate how much weight he gave the evidence relevant to Mitchell's seizure disorder, require this Court to

remand to the Commissioner for reexamination consistent with the foregoing recommendation. <u>Gordon</u>, 725 F.2d at 236 ("the ALJ . . . [did not] indicate[] the weight given . . . [w]e therefore remand . . . the case to the Secretary with directions to the secretary to reconsider the case and to indicate explicitly the weight accorded to various medical reports in the record."); <u>see also</u> <u>Trimble</u>, 2006 WL 229192, at *4 ("The ALJ's failure to indicate whether he considered [the physician's] opinion compels the conclusion that the ALJ's decision is not supported by substantial evidence. The undersigned <u>remands</u> this case to the Commissioner for consideration.") (emphasis added). Accordingly, the Court recommends that the Commissioner's decision be REVERSED and the case be REMANDED for rehearing pursuant to sentence four of 42 U.S.C. § 405(g).

## VI. RECOMMENDATION

For the foregoing reasons, the Court recommends that Defendant's Motion for Summary Judgment be DENIED, that Plaintiff's Motion for Summary Judgment seeking supplemental security income and disability insurance benefits be DENIED in part, but that the motion be GRANTED in part to the extent of vacating and remanding the Commissioner's decision, and that the matter be REMANDED to the Commissioner of Social Security for further proceedings consistent with this Report and Recommendation.

47

## VII. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk specific written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(e) of said rules. A party may respond to another party's specific objections within fourteen (14) days after being served with a copy thereof. See Fed. R. Civ. P. 72(b).

2. A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

United States Magistrate Judge

Norfolk, Virginia
December 15, 2009

## CLERK'S MAILING CERTIFICATE

A copy of the foregoing Report and Recommendation was mailed this date to the following:

Barbara Evans-Yosief, Esq.
2013 Cunningham Drive, Suite 238
Hampton, Virginia 23666
Counsel for Plaintiff

Lawrence R. Leonard, Esq.
Managing Assistant United States Attorney
Office of the United States Attorney
World Trade Center
101 W. Main Street, Suite 8000
Norfolk, Virginia 23510
Counsel for Defendant

Fernando Galindo,
Clerk of Court

By: _____
Deputy Clerk

December 15, 2009